[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 648 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 649 
General Motors Corporation ("GM") appeals from a judgment entered on a jury verdict in favor of Wilbert Jernigan, individually and as father and next friend of Jeffrey Jernigan, a minor child (the father is hereinafter referred to as "Jernigan"), and from the trial court's order denying its *Page 650 
postjudgment motion. We affirm in part, reverse in part, and remand.
 I. Facts and Procedural History[1] A. Overview
On December 10, 1999, Jeffrey Jernigan and his older brother Nickolas Jernigan were involved in an automobile accident. Nickolas, who was 17 years old, was driving a 1993 Oldsmobile Delta 88 automobile ("the Oldsmobile") owned by Jernigan. Jeffrey, who was 12 years old, was a passenger in the front seat of the Oldsmobile. Both boys were wearing their seat belts. The Oldsmobile, traveling at a speed of 50 to 55 miles per hour, crashed into an oncoming 2000 Pontiac Grand Prix automobile ("the Pontiac") traveling at approximately the same speed. The right front corners of both automobiles took the brunt of the impact. In this offset frontal (almost head-on) collision, the Oldsmobile's right front structures crushed toward Jeffrey, striking his head and pinning his feet in the wreckage. He was thrown forward and sustained grave injuries, primarily a skull fracture that required surgical removal of a portion of the left frontal lobe of his brain, resulting in permanent and severe brain damage, personality changes, and learning deficits; he also sustained a second-degree burn to his left foot.[2] Neither Nickolas nor the driver of the Pontiac sustained serious injuries.
Jernigan sued GM and other defendants,[3] seeking compensatory and punitive damages individually and on behalf of Jeffrey based upon the Alabama Extended Manufacturer's Liability Doctrine ("the AEMLD"). The case was tried before a jury from April 22 to May 2, 2002. The jury returned a verdict in favor of Jernigan, awarding $20 million in compensatory damages to Jernigan on behalf of Jeffrey, $2 million in compensatory damages to Jernigan, individually, and $100 million in punitive damages.[4] The trial court entered a judgment on the verdict. GM filed a postjudgment motion renewing previously filed motions for a judgment as a matter of law ("JML"), requesting a new trial, or, alternatively, requesting a remittitur of the damages awards. The trial court remitted the punitive-damages award to $60 million (three times the compensatory damages awarded on Jeffrey's behalf as required by § 6-11-21(a), Ala. Code 1975),[5] but otherwise *Page 651 
denied the postjudgment motion. GM appealed.
 B. Venue and Recusal
Jernigan filed his action in the Bullock Circuit Court. He was a police officer in Bullock County for 20 years before he was elected the county's circuit clerk, a position he held when the case was tried. Jernigan and his family were known and respected in the community.
Jernigan's office is in the same courthouse as the office of the trial judge, L. Bernard Smithart, the only circuit judge in Bullock County. Before he became a judge, Judge Smithart was a partner in one of the law firms that represents Jernigan in this case. In January 2001, GM moved for Judge Smithart to recuse himself, arguing in its motion that he and Jernigan had a "special relationship" and that "it would be improper to have Mr. Jernigan's case litigated in the Court where Mr. Jernigan works daily and before the judge with whom he stands in such a unique relationship." GM also argued that the foregoing circumstances created the appearance of impropriety, thus requiring Judge Smithart's recusal. After a hearing, Judge Smithart denied GM's motion. GM did not seek review of that ruling by this Court.
In early April 2002, Judge Smithart took a three-day vacation trip to Mexico with several lawyers, one of whom was Greg Allen, one of Jernigan's lawyers in this case. Before taking the trip, Judge Smithart contacted the Judicial Inquiry Commission and asked whether taking a vacation trip that included a lawyer involved in a case before him involved a breach of judicial ethics. The executive director of the Judicial Inquiry Commission told Judge Smithart that there would not be any problem with the trip and that it was not necessary to inform the parties about the trip. Nevertheless, in late March, Judge Smithart did inform the parties in writing and offered to cancel the trip if either party objected. GM did not formally respond, although two lawyers for GM told lawyers for Jernigan that GM had no objection. On April 1, however, GM renewed its motion to recuse, and on April 2, filed a motion for a change of venue, citing the trip, Jernigan's prominent position in the community, and the "relationship" between Jernigan and Judge Smithart. After Judge Smithart returned to Alabama, GM supplemented its motion to recuse with further argument about the trip. After a hearing on the evening before trial began, Judge Smithart denied both motions. GM then filed a petition for a writ of mandamus with this Court on April 25, three days after trial had already begun, seeking either Judge Smithart's recusal or a change of venue. This Court denied the petition. Ex parte General Motors Corp.
(No. 1011450, April 30, 2002).
 C. Jury Selection
The jury venire for this case consisted of 70 prospective jurors. The attorneys for both parties and the trial court questioned the venire at length. Ten veniremembers had dealt with Jernigan in his capacity as circuit clerk, 7 either worked in the courthouse or had relatives who did, 13 knew Nickolas, 11 knew Jeffrey, 8 knew about the accident, and all but 2 responded positively when asked whether they were sympathetic to the Jernigan family. Thirteen veniremembers were or had been clients of one of the law firms representing Jernigan, and six had consulted one of those firms.[6] Only three veniremembers indicated *Page 652 
that they could not be impartial, however, and they were struck for cause.
Myron Penn, a lawyer who is of counsel to the law firm of Jinks, Daniel Crow, one of the firms representing Jernigan, was present in the courtroom for jury selection, but did not participate in the trial.[7] The venire included Juanita Penn, whose husband is Myron's uncle; Irene Penn, whose husband is Myron's first cousin; Willie Ann Penn, whose husband is Myron's uncle; and Clarence Penn, who is Myron's second or third cousin. Three of the Penns and three other veniremembers either had worked on Myron Penn's campaign for state senate or had displayed bumper stickers on their vehicles and/or signs in their yards advocating his election. Another veniremember, Tawanda Shepherd, is a cousin of Walter McGowan, a lawyer with Gray, Langford, Sapp, McGowan, Gray Nathanson, a firm that also represented Jernigan in the trial. Shepherd is employed by the Bullock Probate Court and previously had worked with the Jinks firm and with Carmella Penn, a relative of Myron Penn's and an attorney at Beasley, Allen, Crow, Methvin, Portis Miles, P.C., another law firm representing Jernigan. In response to individual questioning, all five of these veniremembers said they could be fair and impartial in the case. GM moved to strike all five for cause, but the trial court denied those motions. GM exercised peremptory strikes as to Irene Penn, Juanita Penn, Clarence Penn, and Tawanda Shepherd; it did not strike Willie Ann Penn, who would become an alternate juror.
One veniremember had consulted James L. Martin of Eufaula, who participated in the trial on behalf of GM, about a legal matter. Another veniremember's uncle had worked until his retirement for King Spalding, an Atlanta law firm representing GM. Four veniremembers had been sued by the Beasley firm or the Jinks firm. In response to individual questioning, all said they could be fair and impartial in the case. However, Jernigan struck several of those veniremembers. Jernigan also struck a veniremember who counsel thought "might [have] some animosity" toward Myron Penn because of his work as chairman of the Bullock County Commission.
The veniremembers were questioned about the "Jere Beasley Consumer Report" newsletter the Beasley firm distributes to a large mailing list. Three veniremembers said they or a relative regularly received the newsletter; only one said she reads it.
A 15-member jury was selected. The jury included three alternates, one of whom was Willie Ann Penn. The alternates were excused before the jury began its deliberations.
 D. Basic Automotive Terminology
The structural portions of an automobile relevant to this case include upper rails (sometimes referred to by the parties as "shotgun beams"), hinge pillars, rocker beams, lower rails, A-pillars, B-pillars, door-guard beams, the floor pan, and the toe pan.
The upper rails are horizontal structures in the fender area above the front wheel *Page 653 
wells that run from the front of the vehicle toward the dashboard. The upper rails terminate at the top of the hinge pillars. The hinge pillars are vertical structures located a couple of feet behind each front wheel well. The hinge pillars are the height of the dashboard. The hinged sides of the front doors are attached to the hinge pillars. The rocker beams are horizontal structures located under the threshold of the door openings. The lower rails are the primary load-carrying beams running inside of and adjacent to the front wheel wells and passing under the floor of the front seat in the area under the feet of the passenger.
The A-pillars run from the top of the hinge pillars to the leading edges of the roof at the corners above the windshield and are angled to conform to the inward tilt of the windshield. The B-pillars are vertical structures located on the side of the vehicle between the front and back seats; they run from the roof to the rocker beams. When the front doors of the vehicle close, the side of the car door containing the handle and latch mechanism makes contact with the B-pillar.
The door-guard beam is a horizontal structure in the door that spans the gap between the hinge pillar and the B-pillar when the door is shut. The door guard beam is located approximately one-third of the distance from the top of the hinge pillar and runs perpendicular to the hinge pillar and parallel to the ground back to the area of the B-pillar near the door handle.
The floor pan is the flat, level portion of a piece of metal beneath the area where the occupants of an automobile place their feet. The toe pan is a portion of that piece of metal that bends at an angle where an occupant's feet would be if extended forward.
 E. Changes in the Second-Generation H-Car
Automobile manufacturers use a capital letter to designate body platforms. The GM "H" platform included the Oldsmobile Delta 88, Pontiac Bonneville, and Buick LeSabre automobiles. The first-generation H-car included the model years 1986-1991; the second-generation H-car included the model years 1992-1999. The GM "C" platform was similar to the H platform, and some documents introduced into evidence refer to the "C/H platform."
The Oldsmobile involved in this litigation is a second-generation H-car. Jernigan offered into evidence a GM document indicating a decline in GM's share of the luxury market from 41% in 1976 to 31% in 1985. Jernigan also offered into evidence a document indicating that GM concluded that one of the reasons for the decline was the similarity between its large luxury models and its less expensive H-cars. To make the luxury models look different from the H-car, GM made the H-car longer and used plastic fenders to give an "expressive" and dynamic appearance. GM changed the upper rail from high-strength steel to "mild" steel to better accommodate the plastic fenders, and also made the lower rails narrower and shorter under the passenger compartment. At the same time it was making the design changes, GM engaged in a cost-reduction program for the H-car.
Other changes made in the second-generation H-car included replacement of the thick stamped-metal door-guard beam with a smaller and lighter tubular door-guard beam with shaved-back ends,[8] thereby reducing the mass of the door-guard beam *Page 654 
and costs. According to a GM document, this change resulted in a "net mass savings" of 46% in the door-guard beam. According to Jernigan's automotive-design engineering expert, James Mundo, the change also resulted in a reduction in strength of 90% in the door-guard beam.
Mundo had over 30 years' experience as an automotive-design engineer. He was employed by Ford Motor Company for 12 years in automotive-body engineering, where he was responsible for crashworthiness and energy-management design. He was ultimately assigned as a technical specialist in the area of crashworthiness of all Ford product lines worldwide. He taught Ford engineering groups worldwide how to design crashworthy vehicles. After retiring from Ford, he started an independent engineering firm. Between 1986 and 1998, his firm did contract work in the area of product design and crashworthiness for various automobile manufacturers, including Ford, Volvo, BMW, Lombardi (a Canadian company), and divisions of GM.
 F. Crash Testing
Automotive vehicles are tested to determine how they respond to a frontal crash using an instrumented test dummy. Head-injury criteria ("HIC") is a standard employed by the National Highway Transportation Safety Administration ("the NHTSA") to evaluate the safety of vehicles. HIC scores are measured on a sliding scale where the lower numbers represent less likelihood of a serious head injury. Federal Motor Vehicle Safety Standard ("FMVSS") 208, promulgated by the NHTSA, mandates that the dummy's HIC score not be above 1000 in a 30-mph frontal fixed-barrier crash. In three FMVSS 208 30-mph tests, the HIC scores of second-generation H-cars were 690, 420, and 590 — well below the maximum of 1000 established by the NHTSA and also below maximum acceptable levels established internally by GM. Mundo testified that he observed that, although the HIC scores on those tests were low, the floor pan collapsed in one of those crash tests.
The NHTSA also operates a New Car Assessment Program ("NCAP") to evaluate the performance of new vehicles. Under the NCAP, vehicles are crashed into a fixed barrier at 35-mph. According to Mundo, the 35-mph crash test uses 33% more energy than the test conducted pursuant to FMVSS 208. The HIC score of the second-generation H-car was 829 on the NCAP test, and the NHTSA awarded the second-generation H-car 4 out of a possible 5 stars.
The forces in the 35-mph crash test are comparable to the forces present in the accident in this case. In two 35-mph crash tests conducted by GM on pre-production second-generation H-cars, passenger HIC scores of 1050 and 1080 were recorded. According to GM, the pre-production test cars are chosen based on a worst-case scenario combination of weight, options, and configuration to allow a margin for error with respect to the actual NCAP tests of production cars. The average HIC scores of five comparable tests conducted by GM on first-generation cars with a "C/H" platform was 954; only one test result was above 1000, but it was significantly above at 1370. The average HIC scores of four second-generation H-car tests conducted by GM, including the two pre-production tests, was 1000; only one fell below 1000, and it was significantly below at 800. GM points out that noproduction second-generation H-car exceeded 1000 in any test. However, if the significantly aberrational number in each set of tests is discarded, the result is an average HIC score for the first-generation C/H-cars of 850 and an average HIC score for the second-generation H-cars of 1067. While this approach leaves the two pre-production *Page 655 
cars in the group of three second-generation H-cars, the third production second-generation H-car in the group tested at 1070, a HIC score almost identical to the score of the two pre-production cars (1050 and 1080).
During his testimony, Mundo was asked, "What does a HIC number of 1050 mean for a passenger in this 1992[sic] Oldsmobile H-car?" He replied: "[A] number above 800, particularly into the thousand range is often what we refer to as a no-build condition. . . . We won't be able to build this car."[9] A GM engineer, Keith Knickerbocker, agreed that if a vehicle's HIC score exceeds 1000 there is a likelihood of serious head injury in a crash, and that if the HIC score is under 1000 it is more likely than not that there will be no serious head injury.[10]
GM notes that one of Jernigan's expert witnesses, Dr. Joseph Burton, agreed that GM is "a world leader in crash test development design and actual implementation." GM says that it runs 500 to 600 crash tests per year and that it has published more vehicle-safety research than all other automobile manufacturers combined. GM maintains internal standards that exceed government standards, including a below-800 HIC score for the 30-mph frontal crash test.[11] In the early 1980s, GM implemented a vehicle-safety improvement program ("VSIP") under which GM worked to make cars better than their predecessors. According to the testimony of Robert Sinke, one of GM's expert witnesses, one of the main objectives of the VSIP was to achieve a "25 percent reduction in the overall societal harm resulting from accidents." Design engineers responsible for the second-generation H-car were required to report to management their safety objectives and compliance with the VSIP.
GM says that, pursuant to the VSIP, it equipped the 1992 H-car with a "structural enhancement package" designed to increase crashworthiness and with "body structure improvement" to reduce the amount of crush to the vehicle in a frontal impact crash. Several areas in the front of the car, including the rocker beam and A-pillar, were reinforced, and the thickness of the lower rails was increased. GM says these reinforcements "participate in a frontal accident in managing the energy." The second-generation H-car also added crush initiators to the lower rails for more efficient energy absorption in frontal collisions. However, Jernigan points out that the emphasis of the "structural enhancement program" was "smoothness and quietness of ride" and that any improvement in the area of crashworthiness was characterized as "other gains." Jernigan contends that none of the crashworthiness *Page 656 
improvements provided additional protection to the occupants in a frontal collision.[12]
GM reports that it ran more than 120 developmental and compliance crash tests on the second-generation H-car, including frontal, side, rear, angle, fixed-barrier, moving-barrier, and car-to-car crashes. Test reports recorded results, and the tests were used to improve the design of the H-car and to correct problems. In its brief to this Court, GM maintains that the second-generation H-car surpassed all GM driver and passenger goals, which were all above federal standards, "for chest g's, chest deformation, and right and left femur loads in all three crash tests (with 1 exception out of 24 measures)." In a 30-mph, 30-degree, right-handed angle, fixed-barrier test GM says most closely approximates the forces involved in this accident, the second-generation H-car recorded a passenger HIC score of 360. Based upon those tests, GM concluded that, compared to the first-generation H-car, "We have better crash numbers. We have better occupant injury numbers . . . and we have better occupant kinematics."
 G. Design Defects and Safer Alternative Design
Jernigan contended at trial that upon impact, the A-pillar collapsed inward into the occupant compartment toward Jeffrey and that Jeffrey's head collided with the structure in the area where the A-pillar meets the dashboard. According to Jernigan, if the A-pillar had not collapsed inward toward Jeffrey, he would not have suffered such severe head injuries. Dr. Joseph Burton, an expert witness for Jernigan in the area of biomechanics, testified that if Jeffrey had had six to eight more inches of space in front of him in the Oldsmobile, he would have made "softer" contact with some of the structures of the Oldsmobile or he might not have made any contact at all. Mundo opined that the alternative designs he proposed, when combined with the restraint system (seat belt) Jeffrey was wearing, would have afforded Jeffrey the additional space needed to avoid significant head contact with the automobile's structures.[13]
As previously noted, Mundo had over 30 years of experience in the field of automotive-design engineering. Mundo identified what he considered to be four primary defects in the design of the Oldsmobile related to its crashworthiness in a frontal collision: (1) the strength of the upper rail; (2) the strength of the tubular door-guard beam; (3) the length and placement of the lower rails; and (4) the omission of a "torque box," described as a metal plate welded *Page 657 
to the lower rail and the rocker beam, thus bridging the space between the two members just behind the front wheel.
Mundo testified that the front end of the first-generation H-car had an upper rail made from high-strength steel, a large stamped-metal door-guard beam, and lower rails that extended further under the passenger compartment than did the rails in the second-generation H-car. He said that each of these structures provided more energy-absorption potential in a collision and that together they provided significantly more protection than was provided by the second-generation H-car. Mundo contrasted the energy-absorbing structures in the rear of the Oldsmobile with those in the front. In the rear, the lower rails run from the bumper just inside the rear wheel toward the front of the car and then turn outward and weld directly to the rocker beam. This joinder produces a continuous beam from the rear bumper to the trunk and out to the rocker beam. In contrast, the front lower rails stop short of the passenger compartment and are not attached to the rocker beam, leaving nothing more than a single thickness of metal welded to the floor pan. Mundo concluded that, by virtue of the design, the rear of the Oldsmobile will absorb substantially more energy in a collision than will the front.
Mundo also compared the Oldsmobile with the Pontiac with which it collided. Mundo pointed out that the Pontiac had a larger door-guard beam and torque boxes that transferred the loads to the frame of the vehicle during a front-end collision. Mundo also noted that the design of the Pontiac included lower rails that ran the length of the vehicle, unlike the Oldsmobile, in which the lower rails had been shortened and narrowed. According to Mundo, the extended lower rails provide a continuous beam to absorb forces in a collision. The torque boxes on the Pontiac tie the front lower rails to the rocker beam, and, according to Mundo, thereby increase the energy-absorbing capacity of the frame of the vehicle.
According to Mundo, although the Pontiac, a lighter vehicle, was subjected to greater forces in the collision than was the Oldsmobile, the integrity of the passenger compartment was maintained much better in the Pontiac than in the Oldsmobile. The lower rail in the Pontiac was bent only slightly in the collision because it gained strength from being attached to the rocker beam by the torque boxes. The floor beneath the passenger compartment of the Pontiac remained flat and did not collapse as did the floor in the Oldsmobile, because the torque boxes in the Pontiac supported the floor. The A-pillar of the Pontiac did not intrude into the occupant compartment on the passenger side.
Describing the damage to the Oldsmobile as the jury viewed the vehicle, Mundo noted that the tubular door-guard beam was bent in the exact spot where the beam end was shaved back. As a result, according to Mundo, its length did not absorb energy in the collision. Mundo described the upper "shotgun beam" as "bent but . . . not necessarily crushed. It just kind of wimped out of the way." Mundo pointed out that the rocker beam was bent at the point where it would have been welded to the torque box had such a system been used. According to Mundo, a torque box "grabs . . . hold of that passenger compartment and frames it at the bottom, so that in the crash event, it will allow the crumple zone up here to do its job." Continuing, Mundo stated that without the torque box, "it's like kicking the legs out from under the table," and "[w]hen that rocker collapsed like that, that allowed this hinge pillar to move into the space where Jeffrey Jernigan was sitting." With no *Page 658 
lower rail or torque box to support the floor pan, he said, the floor pan collapsed. When the floor pan of the Oldsmobile collapsed, the forward edge of the passenger seat dropped, causing the entire seat to tilt forward. Mundo contended that the collapse of the floor pan he had previously noted in the FMVSS 208 30-mph testing of the second-generation H-car gave GM notice of the potential for occupant-compartment collapse at a higher speed. According to Mundo, the collapse of the floor pan and the inability of the door-guard beam to keep the A-pillar and the B-pillar separated caused the A-pillar to move into the occupant compartment. Mundo said his alternative designs would have prevented the A-pillar from moving.
When asked whether he had "an opinion based upon [his] experience in automotive design that . . . the design without the torque box and the toe pan beam" was safe, Mundo answered affirmatively and said, "I believe that there is a defect there and that it's not safe because those beams only tie to a single piece of metal called the floor pan." Then, when asked whether there were "alternative designs available back at the time the Oldsmobile was designed that would have minimized or eliminated the problem with the toe pan," he explained:
 "There are a lot of elements that come to play in the crumple zone. And I said here it's an energy management system so we need to manage the energy, which means engineers need to design components, subsystems, pieces to do certain kinds of jobs to manage that. That has been known for a very long time.
 "Because rails that the framing members that are running forward to connect your bumper and to which your engine is bolted down, those have to be inboard of your tires. And because the primary beams that run under the doors, the rocker beams, they have to outboard of the tires. The two are not lined up. And for a very long time, I'm one of the engineers that have known that. And the simplest solution to the problem is what we call a torque box. It's a fancy word for simply welding a beam from the rocker to the primary frame under the car.
 "Now, that alone adds a continuity where you take that primary frame, turns, goes around behind the tire — torque box — turns into the rocker, and runs down the rest of the car. Makes sense, a continuous flow of beam. Having them not connected to one another is why we see the floor moving as we see it. Now, that torque box has been around in many cars for a very long time.
 "The only other element that would enhance and support would be to connect between the frames with a cross member, as we showed earlier this morning, the torque box, then the rail, and then an element that runs between the rails to the next frame to the torque box to the other rocker. That has been around for a long time."
When asked whether, based on his knowledge and training, he thought there were "alternative designs available at the time [the Oldsmobile] was manufactured that would have minimized or prevented" the damage that occurred to the Oldsmobile in the collision, Mundo explained:
 "The answer is yes, there are alternatives; and, yes, there were alternatives at that time. Engineers have been designing cars for crash for energy management systems for quite sometime. Even in the early '80s or when this vehicle was redone for version 2, the early '90s.
". . . . *Page 659 
 "We've spoken of the torque boxes and the things in the lower floor area. There are some additional things we can do down there by putting internal stiffeners inside of the beams, beefing them up on the inside. That's one thing. But moving on up, the thing that we can do is to have high strength in the shotgun [beam] area, which was removed. The things we could have done would be to have beefier door guard beams rather than shaving them back."
When asked why it is important to have a strong upper rail, Mundo stated:
 "Well, because if you don't have a strong upper rail in the requisite door structure, then it allows this pillar to move around. And worse yet, it may allow the pillar to come on into the occupant compartment."
Mundo then testified:
 "Q. [I]n all of the information you reviewed in this case, examination of the vehicle, your knowledge and training, your experience with crash tests, do you have an opinion as to whether these alternative designs you referred to would have made a difference in this crash?
". . . .
 "A. With all of my experience and the number of vehicles in which I have been involved in crashes and reviewing these kinds of things from a design engineer's point of view, I believe that these alternative designs would have made a difference. And I believe that the difference would have been to preserve the occupant space such that the restraint system which [Jeffrey] was wearing could have had an opportunity to do its job.
 "Q. And if the alternative designs would have been used, what would have been the difference as far as the space in the occupant compartment?
 "A. I really don't know how much intrusion came in to the car. But what I do know as a design engineer is that the restraint system was [designed] to allow the occupant to stroke through the seat belt system without striking dash panels and hinge pillars. So there is usually not a lot of margin for error here in that allowing these pillars to come in at all presents a risk.
 "Q. Could it have been designed to keep the A-pillar in place?
"A. It could have, yes.
 "Q. Had the alternative designs been used that you described, you believe that would have occurred?
"A. I believe so . . . yes."
GM does not challenge Mundo's experience as a design engineer or his analysis of the Oldsmobile's failed performance in the accident. GM challenges Mundo's opinion that his proposed alternative designs would have performed better under the circumstances of this accident and provided the six to eight inches of extra space Dr. Burton testified was necessary, thereby preventing Jeffrey's injuries.
GM offered evidence indicating that it had crash-tested the "mild" 30-ksi steel used in the upper rails and concluded that it did not degrade the crashworthiness of the vehicle. GM contended that the door-guard beam complied with FMVSS 214,[14] *Page 660 
as well as with GM's higher internal standards, and was thicker and of greater strength than that found in the first-generation H-car. GM said that the test results for the door-guard beams in the first- and second-generation H-cars were the same. The shortening and narrowing of the lower rails resulted from GM's "structural enhancement program" to improve crashworthiness and to reduce noise, vibration, and harshness. GM used, in lieu of the torque box, a "shear plate" which, according to GM, performed the same function as a torque box. In the late 1970s and the 1980s, GM says, it studied the effect of torque boxes and determined that they were unnecessary. Jernigan points out that the Pontiac, also a GM vehicle, had torque boxes.
Mundo did not test his alternative designs. Instead, he relied on tests performed on the first-generation H-car, which he considered to have a stronger front-end structure, pointing to a passenger HIC score of 539.2 in one 35-mph frontal-barrier test. He also relied upon the FMVSS 208 crash test of the second-generation H-car in which he observed the floor pan collapsing and upon the collision itself, inspecting and assessing the Oldsmobile and the Pontiac just as he would have done in a crash test. Finally, Mundo relied upon his own extensive experience.
GM attempted to test Mundo's alternative designs by using a Ford Taurus automobile, which it contended Mundo had described in a pretrial deposition as embodying his proposed alternative designs. Under the guidance of an accident reconstructionist, GM conducted a crash test with a Taurus and a Pontiac comparable to the Pontiac involved in the collision. According to GM, the passenger dummy in the Taurus experienced a HIC score of 7300 and the A-pillar of the Taurus crushed six inches further into the occupant compartment than did the A-pillar of the Oldsmobile, providing exactly the reverse of the additional six to eight inches that Dr. Burton stated was necessary to avoid Jeffrey's injuries. Jernigan objected to evidence of the crash test between the Taurus and a Pontiac. The trial court deferred its ruling on Jernigan's objection and permitted a video of the crash test to be shown to the jury during opening statements. In his testimony, Mundo said that the test was "rigged" to come out in GM's favor because, he said, GM had placed sandbags in the Taurus instead of instrumented dummies. GM had said that using sandbags was necessary to bring the Taurus to a weight, including occupants, comparable to the Oldsmobile at the time of the collision. Mundo stated that sandbags do not load a vehicle in the same way an occupant does, and that dummies were available that could have been used to add weight to the vehicle. Mundo also criticized the test because the Taurus was a smaller, lower car than the Oldsmobile, which has a longer wheel base and is wider. The Taurus is rated as a "midsize" vehicle; the Oldsmobile is rated as a "large" vehicle. The bumper heights of the Taurus and Pontiac did not match in the same manner that the Oldsmobile and Pontiac did. According to Mundo, the differences explained why the Pontiac drove over the top of the smaller Taurus in the crash test.
The trial court excluded the test and any opinions based on it because of those excessively dissimilar factors, illustrating its point by referring to differences in the "car heights, the different weights, the types and styles of the car." The trial court found that the crash test between the Taurus and a Pontiac was "in no way similar to the Jernigan wreck." The court further found that Mundo did not rely on the Taurus as a safer alternative design. The trial court instructed the jury that the *Page 661 
test did not appear to be "rigged." The trial court further instructed the jury to disregard both the video shown by GM in the opening statement and any rebuttal testimony introduced by Jernigan.
 II. GM's Motion for a JML A. Standard of Review
Our standard of review on a motion for a JML is well settled.
 "When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126 (Ala. 1992)."
Waddell Reed, Inc. v. United Investors Life Ins. Co.,875 So.2d 1143, 1152 (Ala. 2003).
 B. Standard for Admitting Expert Testimony
GM argues that we should change the law in Alabama to embrace the standard for admitting expert testimony set forth in Daubertv. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579,113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), instead of retaining the standard set forth in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), which we have followed for many years. See CourtauldsFibers, Inc. v. Long, 779 So.2d 198 (2000), and Southern EnergyHomes, Inc. v. Washington, 774 So.2d 505 (2000). We decline to change the standard in this case. As we discuss in Part II.C. of this opinion, regardless of whether we abandon Frye and embraceDaubert, Mundo's expert testimony was admissible and offered substantial evidence of alternative designs. In fact, the Advisory Committee Notes to Rule 702, Fed.R.Evid., when it was amended to reflect the issuance of Daubert and related cases,[15] contain a statement that particularly applies to Mundo's expertise in this case. The Comments state:
 "Nothing in this amendment is intended to suggest that experience alone — or *Page 662 
experience in conjunction with other knowledge, skill, training or education — may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. See, e.g., United States v. Jones, 107 F.3d 1147 (6th Cir. 1997) (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail); Tassin v. Sears Roebuck, 946 F.Supp. 1241, 1248 (M.D.La. 1996) (design engineer's testimony can be admissible when the expert's opinions `are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches'). See also Kumho Tire Co. v. Carmichael, [526 U.S. 137, 156] 119 S.Ct. 1167, 1178 [, 143 L.Ed.2d 238] (1999) (stating that `no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.')."
(Emphasis added.) Clearly, Mundo's experience and expertise were factors the jury could properly consider in this case, regardless of whether we reviewed his testimony under the standard enunciated in Daubert or the standard enunciated in Frye.Courtaulds, 779 So.2d at 202.
 C. Evidence of a Safer, Practical, Alternative Design
In an AEMLD case, the plaintiff has the burden of proving a design defect.
 "In order to prove that a product is defective for purposes of the AEMLD, a plaintiff must prove that
 "`"a safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product]. The existence of a safer, practical, alternative design must be proved by showing that:
 "`"(a) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design; and that
 "`"(b) taking into consideration such factors as the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used."'
 "Beech v. Outboard Marine Corp., 584 So.2d 447, 450
(Ala. 1991) . . ., (quoting General Motors Corp. v. Edwards, 482 So.2d 1176, 1191 (Ala. 1985), overruled on other grounds, Schwartz v. Volvo North America Corp., 554 So.2d 927 (Ala. 1989))."
Hannah v. Gregg, Bland Berry, Inc., 840 So.2d 839, 858 (Ala. 2002) (emphasis omitted).
GM first argues that the trial court should have excluded Mundo's testimony in its entirety because he did not test, build, model, or draw his proffered alternative designs, and it insists that Mundo's untested and subjective opinion was inadmissible. GM also criticizes Mundo's testimony because, it argues, Mundo did not offer the opinion that his untested alternative designs would have provided the six to eight extra inches of space that Dr. Burton testified would have been required to prevent *Page 663 
Jeffrey's brain injury and because Mundo did not know how much more space Dr. Burton said was needed. In its brief to this Court, GM points to Mundo's testimony, based on his experience as an automotive-design engineer, that he "`believe[d] that these alternative designs would have made a difference' and `preserved the occupant space' by preventing any intrusion of the A-pillar." In support of its argument that Mundo's testimony was inadmissible, GM relies on Slay v. Keller Industries, Inc.,823 So.2d 623, 626 (Ala. 2001), in which this Court held:
 "Mere assertions of belief, without any supporting research, testing, or experiments, cannot qualify as proper expert scientific testimony under either the `general-acceptance' standard enunciated in Frye or the `scientifically reliable' standard of Daubert."
GM characterizes as deficient Mundo's failure to personally perform any tests, and then concludes that Mundo's opinions are not supported. GM also denounces Mundo's opinions as nothing more than "mere assertions of belief." After reviewing all of Mundo's testimony, we conclude that GM has mischaracterized Mundo's opinions.
The allegedly defective product in Slay was a ladder, and this Court disallowed an expert's opinion. There, the expert admitted that he had performed no tests on the ladder in question or on exemplar ladders. However, he went further and admitted that he had not determined that the ladder on which Slay was injured was in any way defective in its design, manufacture, or distribution, or that the manufacturer had failed to provide adequate warnings. Consequently, the only evidence available to Slay was his expert's "bald assertion" that the ladder was "possibly underdesigned." 823 So.2d at 626.
Mundo's testimony cannot be fairly compared to that of the expert in Slay. Although Mundo did not personally conduct any tests, unlike the Slay expert he had access to significant test data from GM, as well as to the two automobiles from the accident itself, all of which he claimed he had relied upon. He also had considerable personal expertise, a factor GM conceded. Mundo relied upon GM's test results concerning both the first- and second-generation H-cars, actual evidence from the collision, and his design expertise. We cannot agree with GM's contention that Mundo had no basis upon which to render an expert opinion.
GM also contends that the trial court erred in denying its motion for a JML because, it says, Jernigan did not introduce sufficient evidence of the availability of a safer, practical, alternative design. GM's appellate counsel[16] have parsed the record and seized upon what they depict as a fatal gap in the proof of the availability of a safer, practical, alternative design. GM states that Dr. Burton testified that to avoid Jeffrey's injuries, the intrusion of the right front "structures" had to be reduced by six to eight inches. GM then states in its brief to this Court that Dr. Burton "could not and did not say whether Jeffrey impacted the A-pillar or another of the car's right front structures." GM then argues that Mundo's testimony regarding an alternative design dealt only with the A-pillar, thus leaving a gap in proof because, it argues, Mundo did not testify concerning what GM refers to as "an alternative design that would have reduced the *Page 664 
intrusion of all of those structures that Jeffrey may have impacted by Burton's necessary 6-8 inches." GM also points to the following exchange between GM's trial counsel and Dr. Burton on cross-examination:
 "Q. . . . And I believe you told us in terms of the exact place that Jeffrey's head hit in the accident, you weren't sure if it was the A-pillar or the dash?
 "A. I don't have a marker like I have that says I'm going to put my finger on the exact spot, but I can put my hand in the general area. That's all.
"Q. Either the dash or the A-pillar?
"A. Yes."
In order to accept GM's argument, we would have to overlook other testimony the jury could have properly considered. First, with respect to GM's attempt to confine Dr. Burton's testimony regarding the areas of the passenger compartment that could have caused Jeffrey's head injury to "[e]ither the dash or the A-pillar," Dr. Burton also testified on direct examination:
 "It's my opinion that [Jeffrey] has a very severe brain injury as a consequence of his head striking some part of the right front side of the dash where the pillar that supports the windshield comes down on the right side and where the door panel comes in that corner, right up in there."
(Emphasis added.) Obviously Dr. Burton was gesturing at this point, and the record does not include a description of where the witness was pointing. Neither the California attorney who signed the appellate brief, the Birmingham attorney who presented oral argument on behalf of GM, nor this Court had the opportunity to hear the evidence and to view the gestures of the witness as did the jury and the trial court. Dr. Burton continued:
 "It's my opinion that if the space in which Jeffrey had been seated, the occupant space, if the dash had been kept further away from him, if the support pillar for the window had not straightened up and came [sic] in toward him, because he was wearing a restraint and because it looked like the restraint worked as it should have, that he would not have this severe injury which was a life-threatening injury, and the severity of it was such that in some people it could have caused him to be dead. But in order to protect, it is my opinion, you need to have more space in the area where Jeffrey was sitting."
Dr. Burton identified "the right front side of the dash where the pillar that supports the windshield comes down on the right side and where the door panel comes in that corner, right up in there." He then identified what he called "the support pillar for the window," an obvious reference to the A-pillar, and said had the support pillar "not straightened up and [come] in toward him," Jeffrey would not have been so severely injured.
Dr. Burton further testified, describing a photograph he took of the Oldsmobile:
 "I took [the photograph] to show the profile — primary profile of damage to the front. This is the A-pillar I was talking about which should be sloped down like this. And instead, the bottom of it has been pushed back, and not only back, it has been pushed somewhat inboard into where the occupants are."
Dr. Burton continued, comparing photographs he took of the Pontiac with photographs of the Oldsmobile:
 "You can see very easily from looking at photos of the Pontiac that this pillar is not nearly as vertical. The roof line is not kinked up. The right front door is *Page 665 
not deformed like this. There is more space inside that Pontiac, for whatever reason, than there is in this Oldsmobile."
Although GM attempts to attribute to Dr. Burton the mere identification of "structures" as the site where Jeffrey struck his head, Dr. Burton's testimony quoted above contradicts this theory. Moreover, Dr. Burton's testimony about "structures" follows his specific testimony previously noted as to the site of the impact. Dr. Burton testified:
 "It's my opinion that if Jeffrey had 6 or 8 inches of space that he didn't have, that the [seat] belt would have been allowed to give him that extra distance. . . . And that even if he did make contact with some of the structures, it would be a softer contact. May not have made any contact at all. If he made contact, it would be much softer. He wouldn't have the severe brain injury that he has. And he has no other severe injury. . . . So if we can keep his head from having a severe impact with the structures in front of him, Jeffrey's okay."
Contrary to GM's argument, Dr. Burton's reference to "structures" related to areas in the vehicle that could not have caused serious injury and that reference, therefore, cannot serve as the basis for a gap in proof as to the availability of a safer, practical, alternative design.
This Court has held in a products-liability case that we do not permit the losing party to "cherry-pick" a single answer to a question. We must look at the evidence as a whole.
 "Although certain portions of [the plaintiff's expert's] testimony were somewhat self-contradictory (to the extent that he later admitted that he was of the opinion that the design defects alone would not have caused this tipover), viewing the evidence in a light most favorable to the plaintiffs, we hold that the jury was presented with sufficient evidence to support a verdict of liability against [the defendant] based on design defects."
Mallory v. Hobbs Trailers, 554 So.2d 966, 969 (Ala. 1989).
Based upon Dr. Burton's testimony, the jury reasonably could have concluded that the cause of Jeffrey's injuries was a collision between Jeffrey's head and the structure of the car where the dashboard meets the A-pillar. The jury also could have concluded that the dashboard came in toward the passenger compartment when the A-pillar, which is ordinarily at an angle commensurate with the angle of the windshield, "straightened out" because it was unable to maintain that angle. Had it maintained the angle, the dashboard would not have intruded into the passenger compartment. In this context, the reference to impact at "either the dash or the A-pillar" does not mean, as GM argues, that there is a fatal gap in the proof. Moreover, GM has not shown that Dr. Burton was unable to identify the appropriate structural components involved in causing Jeffrey's injury.
The dissent states that Jernigan presented "evidence indicating only that certain design changes, among others, were made in the second-generation H-car that, considered in isolation from the other aspects of the overall design of the vehicle, contributed to Jeffrey's injury." 883 So.2d at 676. Jernigan's experts, however, did not consider the design changes in isolation. Testifying at a service station about the two automobiles involved in this accident, where both vehicles were on display for the benefit of the jury, Mundo stated:
 "These vehicles [the Oldsmobile and the Pontiac] were in the same accident. According to Newtonian physics, the same *Page 666 
forces applied to these cars. If you will, starting with this car [the Oldsmobile] up front, notice how this upper shotgun beam [the upper rail] is bent but it's not necessarily crushed. It just kind of wimped out of the way. This is the beam that used to be high-strength steel that they put low-strength steel in for the fenders. Notice how it's just bent, not crushed. Remember the soda straw where we talked about how it would crush or the accordion and that [GM] in that document put things like holes in here and so forth — like triggers — to allow this thing to crush. It didn't. It just bent.
 "When that failed and in combination with the backup structure, secondly notice how this rocker [beam] — look how it's bent, turned all the way inboard. That part of the rocker [beam] would have been tied to that part of the torque box. That could not happen as we saw over here in the Pontiac. But over here because they're not tied together, notice how that collapsed. When that rocker [beam] collapsed like that, that allowed this hinge pillar to move into the space where Jeffrey Jernigan was sitting. That's one.
". . . .
 "Now we're looking at the door-guard beam itself. That's this pipe that we looked at earlier. You see where it's shaved from here? It's shaved back to almost nothing as it welds here. And you can see where it was shaved here. See where it's bent there? And then it goes around the corner all the way over to here. That bend there is sympathetic with the bend here. The two of them bent together around the corner. When that happened, again it was up to this and it was up to this to keep that and that from closing on one another. But they bent. They bent because they shaved it back.
 "Those permitted pillars, the floor — You take all that combination together and you can see that it went into the people zone. So now when you ride the seat belt down in the crash, well, there's hardly enough room in there as you can imagine for a human being to sit, much less ride the belt down.
 "The defects again, this beam, notches, not enough welds, door-guard beam shaved it back, rocker [beam] not tied to the primary beams underneath. That swings on into the toe pan area where there's not enough reinforcements inside the rail to do the job. All of those added together along with weakening the shotgun [beam], the whole thing just caved right on him."
(Emphasis added.) Mundo clearly based his opinion on the effect of the combination of the criticized design changes that he identified in the second-generation H-car, not on the effect of each design change in isolation.
Finally, GM argues that Mundo's alternative designs changed throughout the course of the litigation. GM contends that Mundo first testified in his deposition that the Ford Taurus embodied his alternative designs,[17] changed his theory at trial to *Page 667 
point to the 2000 Pontiac as a better design, and then at oral argument changed again to rely upon the design of the first-generation H-car. We do not find that to be true. Throughout Mundo's testimony, he consistently pointed to the same defects he identified in the upper rails, the door-guard beams, the front lower rails, and the lack of torque boxes. He used different examples to illustrate his alternative designs, but the fact that he used more than one example does not change his underlying theory that safer, practical, alternative designs were available.
The dissent attempts to eliminate the safer design associated with the Ford Taurus. As we discuss in detail in footnote 17, the record reflects that Mundo considered the Taurus as one of three examples that illustrated his alternate designs but that the parties disputed whether he had ever relied solely upon the Taurus and then abandoned that theory.
The dissent then attempts to eliminate the safer design associated with the Pontiac. The dissent concludes that the 2000 Pontiac Grand Prix cannot qualify as an alternative design because there was no evidence indicating that its design was available to GM when it manufactured the Oldsmobile. To the contrary, Jernigan established that the torque boxes in the Pontiac were comparable to the torque boxes used in automobiles Mundo designed in the 1980s. The Pontiac also had the longer front lower rails Mundo had identified in the first-generation H-car and in the rear of the Oldsmobile.
After attempting to eliminate the Taurus and the 2000 Grand Prix as examples of a safer, practical, alternative design, the dissent focuses its attention exclusively on the proof relating to the first-generation H-car. Assuming only for the sake of argument that the elimination of the Taurus and the 2000 Grand Prix stands on solid ground, the conclusion in the dissent that Jernigan failed to prove that the changes made in the first-generation H-car to produce the second-generation H-car made the second-generation H-car defective disregards the evidence in the record. Likewise, the conclusion in the dissent that "[t]here is no meaningful discussion of the utility of the first-generation H-car in comparison to the Oldsmobile" is also unsupported by the record. 883 So.2d at 676. *Page 668 
Proof that the first-generation H-car was less likely to cause serious head injury on collision would be evidence of greater utility of the first-generation H-car. See footnote 12. A showing that the redesign of the second-generation H-car made it more likely to expose an occupant to a devastating head injury is evidence of the greater utility of the first-generation H-car. Jernigan presented evidence from which the jury could have drawn such a conclusion.
Jernigan's proof cannot be criticized, as the dissent contends, for failure to prove "overall utility" because of what the dissent perceives to be an absence of evidence concerning factors such as "`styling, cost, and desirability [of the product], its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect.'" 883 So.2d at 675 (quoting Hannah v. Gregg, Bland Berry, Inc.,840 So.2d 839, 858 (Ala. 2002)). With respect to styling and desirability, Jernigan offered evidence indicating that GM made structural changes in its second-generation H-car to make it look less like GM's luxury line of vehicles because of concerns that GM was losing sales of its luxury vehicles to the first-generation H-car. Those structural changes permitted changes in styling. The jury had before it evidence that, if it so chose, could justify the structural and concomitant styling changes as a legitimate business concern for which GM should not be faulted. Of course, the jury did not find that the utility in the styling change justified the increased danger to passengers. Moreover, evidence that the styling of the first-generation H-car was so popular that it was taking sales away from GM's luxury line effectively eliminates any basis for a conclusion that incorporation of Jernigan's safer, practical, alternative design would produce an ugly duckling with the aesthetic appeal of an army tank. Further, the addition of a beam or a torque box to support the floor pan under the feet of the passenger, a design found in cars manufactured before 1992 and involving an area not visible to the style-conscious buyer, does not implicate the component of design related to styling.
With respect to cost, Jernigan offered evidence that the redesign resulted in cost savings of $2,500 per second-generation H-car. GM contended that only $100 of this amount was allocable to the structural changes in the second-generation H-car. The jury had before it evidence that, if it so chose, could justify the structural changes to the second-generation H-car as a legitimate business concern for which GM should not be faulted. Of course, the jury did not find that the cost savings in the structural changes justified the decrease in the safety of passengers. Further, the fact that GM successfully marketed thousands of units of the first-generation H-car with the structural design advocated by Jernigan was evidence that the jury could consider in evaluating whether the alternative design was practical from a cost standpoint.
With respect to the foreseeability of this particular accident, Jernigan established that a front-end collision is so foreseeable that GM actually performs tests involving such collisions. No rationally functioning jury could conclude that GM was taken by surprise when this almost head-on collision was reported to it. With respect to the likelihood of injury and the probable seriousness of the injury if such an accident occurred, Jernigan offered the test results performed by GM on the first-generation H-car and the second-generation H-car dealing with risk of head injury. The jury had before it evidence that, if it so chose, could justify the conclusion that one of the *Page 669 
consequences of GM's structural changes that could not have been foreseen was serious injury to the occupants. The jury, however, did not find that the injury and its seriousness was unlikely.
The conclusions in the dissent that the main opinion contains "no meaningful discussion of the utility of the first-generation H-car in comparison to the Oldsmobile," 883 So.2d at 676, and that Jernigan, through his expert, Mundo, "failed to prove that those designs were in fact safer and practical when more than just the performance of the A-pillar was considered, namely, the overall design, styling, and cost of the vehicle were considered," 883 So.2d at 677, cannot stand scrutiny on this record.
Jernigan offered credible evidence of various safer, practical, alternative designs that would have prevented the compression of the occupant compartment that resulted in the impact to Jeffrey's skull.[18] The requirement for proving that a safer, practical, alternative design was available is evidence indicating (1) that the plaintiff's injuries would not have occurred or would have been less severe, and (2) that the usefulness of the alternative design outweighed the usefulness of the design used. Hannah, 840 So.2d at 858.[19] Jernigan produced such evidence. While GM offered rebuttal evidence, the jury had before it evidence from which it could have found in favor of either GM or Jernigan. The jury made its decision, and it is not this Court's function to reweigh the evidence the jury found to be adverse to GM at trial.
Viewing all of the evidence, not merely isolated portions of the transcript, in favor of Jernigan, the nonmovant, as settled precedent requires, we conclude that Jernigan introduced sufficient evidence to allow him to present to the jury the question whether a safer, practical, alternative design was available to GM when it manufactured the Oldsmobile. Therefore, the trial court properly denied GM's motions for a JML, and we affirm that portion of the postjudgment order.
 III. GM's Motion for a New Trial
GM argues that the trial court erred in denying its challenges for cause of certain prospective jurors. This Court reviews a claim that the trial court erred in denying a challenge for cause to see if in denying the challenge the trial court exceeded its discretion. Hutchins v. DCH Reg'l Med. Ctr., 770 So.2d 49, 53
(Ala. 2000). "The trial court is vested with broad discretion in determining whether to sustain challenges for cause, and the trial court's decision will not be interfered with *Page 670 
unless clearly erroneous." Black Belt Wood Co. v. Sessions,514 So.2d 1249, 1255-56 (Ala. 1986).
Having dealt with the only issue that would have been dispositive of all other issues and having found no error as to that issue, we turn to GM's lead argument in its brief and at oral argument. GM argues that it is entitled to a new trial because the trial court erred in denying five of its challenges for cause.
Section 12-16-150(11), Ala. Code 1975, provides that a prospective juror in a civil case "related by consanguinity within the ninth degree or by affinity within the fifth degree . . . to any attorney in the case to be tried" is subject to challenge for cause.[20] GM argues that it was prejudiced as a matter of law because it was forced to use some of its peremptory challenges to remove prospective jurors who were related to lawyers in the case to be tried, and that the jury, as finally constituted, included members who had been clients of one of the law firms representing Jernigan or who had been injured in automobile accidents or who had relatives who had been so injured. Furthermore, GM says, it was forced to allow one of Myron Penn's relatives to serve as an alternate juror and, although she did not deliberate, she was present for several days with those jurors who did deliberate.
Jernigan argues that Myron Penn was not an "attorney in the case to be tried" because he was "of counsel" to the Jinks law firm rather than a full-time attorney in the firm, he maintained no office with the firm, he had no financial interest in the firm or in the case, and he did not participate in the trial. He was merely in the courtroom, Jernigan says, when jury selection took place. We reject that argument for two reasons.
First, it is clear from the record that Myron Penn's name appeared on the letterhead of the Jinks firm, although he was listed "of counsel." Moreover, questioning from GM's counsel elicited responses from the veniremembers that were consistent with their understanding that Myron Penn had an ongoing relationship with that firm. GM's counsel asked the veniremembers whether they understood that Myron Penn "is of counsel to the Jinks, Daniel Crow firm" and that "he works for their firm," to which he received affirmative responses. GM's counsel also asked, without objection:
 "Based on your relationship with Myron, the — the individuals who answered that question about being related, do you think you can be a fair and impartial juror in this case, knowing that he is a part of the firm that is helping represent Mr. Jernigan? You can?"
He then asked Willie Ann Penn, Irene Penn, Juanita Penn, and Clarence Penn, individually, whether his or her being related to Myron Penn would affect his or her judgment in the case, and each responded that it would not. Jernigan's counsel did nothing to correct the veniremembers' perception that Myron Penn was an attorney with the Jinks law firm.
Second, this Court has already construed § 12-16-150(11) to reach relatives of members of a law firm who are not present in the courtroom while the jury is being selected. In Williams v.Dan River Mills, Inc., 286 Ala. 703, 246 So.2d 431 (1971), the Court stated the facts and the issue to be addressed as follows:
 "The grounds of the original motion for new trial which the plaintiff insists *Page 671 
here were well taken and required the rendition by the trial court of a judgment granting the plaintiff a new trial aver, in effect, that one of the jurors who served on the case failed to disclose upon voir dire examination by the trial court that he was related by blood or marriage within the prohibited degree as prescribed by the law of this state to a member of a legal firm which represented the defendants, which relationship was unknown to the plaintiff or to his attorneys, and thereby plaintiff was deprived of his right to advisedly strike said juror whose service on the trial jury was to the prejudice and injury of the plaintiff.
 "In qualifying the jury, the trial court advised the prospective jurors that the defendants were represented by two law firms. The court identified them by firm names and identified the member or members of those firms who were present in court at the time the jury was being qualified. The court then propounded the following question: `Are any of you kin by blood or marriage to any of the gentlemen to either one of those law firms?'
 "It is conceded that none of the prospective jurors responded to that question.
 "It is further conceded that one of them, to whom we will sometimes hereinafter refer as the subject juror, was the first cousin of the wife of a member of one of the law firms which represented the defendants, at the time of their marriage in 1948. That member of the firm was not in court at the time."
286 Ala. at 705, 246 So.2d at 432 (emphasis added). The Court held that "[t]he subject juror was related by affinity within the fifth degree according to the rules of the civil law to a member of one of the law firms which represented the defendants" and that "the subject juror could have been successfully challenged for cause in a case in which the wife's husband or his firm
appeared as counsel." 286 Ala. at 706, 246 So.2d at 432 (emphasis added).
Myron Penn was an "attorney in the case to be tried" within the meaning of § 12-16-150(11), as construed in Dan River Mills. GM was entitled to have its challenges for cause as to Penn's relatives granted. We note that the trial court based its denial of the challenges for cause made pursuant to § 12-16-150(11) on an interpretation of the statute provided by Jernigan's counsel — that the statute applied to persons within a certain degree of kinship to parties in the case, but not to relatives of the lawyers in the case. Because the statute clearly applies to veniremembers who are related to attorneys, the trial court's denial of GM's five challenges for cause based upon §12-16-150(11) was erroneous. We must now determine whether the denial of those five challenges for cause deprived GM of a substantial right. See Southern Ry. v. Milan, 240 Ala. 333,199 So. 711 (1940).
At least since 1965, this Court has held that the erroneous denial of a challenge for cause was reversible error. The Court initially did so in the aftermath of Swain v. Alabama,380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled, Batson v.Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), dealing with challenges to jurors in a capital-murder case. However, long before Swain, this Court had treated the denial of a challenge for cause as harmless error where a peremptory challenge was thereafter used to remove the prospective juror from the venire and an impartial jury was seated. See Turner v.State, 160 Ala. 55, 49 So. 304 (1909).
The United States Supreme Court retreated from Swain in Rossv. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 *Page 672 
(1988), and United States v. Martinez-Salazar, 528 U.S. 304,120 S.Ct. 774, 145 L.Ed.2d 792 (2000), applying a harmless-error rule comparable to that employed by our Court in Turner v.State. We followed suit in two cases dealing with the trial court's erroneous granting of a challenge for cause. SeeDailey v. State, 828 So.2d 340 (Ala. 2001), and Evans v.State, 794 So.2d 411 (Ala. 2000). In Bethea v. SpringhillMemorial Hospital, 833 So.2d 1 (Ala. 2002), we overturned several post-Swain cases and applied the harmless-error rule to the trial court's erroneous denial of a challenge for cause.
There is an important distinction between the present case and the Court's pre-Swain cases embracing harmless error and its post-Ross and Martinez-Salazar return to the harmless-error rule. In each instance in which we have applied the harmless-error rule, we have been presented with only one
erroneous ruling on a challenge for cause. Here we have five.
In an interesting footnote in Martinez-Salazar, the United States Supreme Court stated:
 "Relying on language in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), as did the Court of Appeals in the decision below, Martinez-Salazar urges the Court to adopt a remedy of automatic reversal whenever a defendant's right to a certain number of peremptory challenges is substantially impaired. Brief for Respondent 29 (a `"denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice"') (quoting Swain, 380 U.S., at 219, 85 S.Ct. 824). Because we find no impairment, we do not decide in this case what the appropriate remedy for a substantial impairment would be."
528 U.S. at 317 n. 4, 120 S.Ct. 774 (emphasis added).[21]
Because Ross, Martinez-Salazar, Bethea, and Turner all involved only one juror, those cases can be distinguished. GM was forced to use 5 of its 19 peremptory challenges, over 25%, to eliminate potential jurors who should have been struck by the trial court pursuant to GM's challenges for cause. The jury that was seated consisted of jurors who had been clients of one of the law firms representing Jernigan, who knew Jernigan and/or his witnesses, and who had either been injured themselves in automobile accidents or who had relatives who had been injured, two of whom had filed lawsuits as a result. Presumably, such jurors would have been struck by GM through the exercise of its peremptory challenges had the full arsenal of such challenges been available against jurors who remained after correct rulings on the challenges for cause.[22] The fact that GM left one of Myron Penn's relatives on the jury, albeit as an alternate, demonstrates that it could not exercise enough peremptory challenges to remove all of the veniremembers it had challenged for cause.
Based upon the unique facts and circumstances here presented, the trial court, by denying five of GM's challenges *Page 673 
for cause that should have been granted, substantially impaired GM's right to the use of its peremptory challenges in selecting a jury. In this case, unlike Bethea, the jurors who ultimately were selected fell in the category of jurors who would likely have been the subject of peremptory challenges had such challenges been available. Therefore, we conclude that the multiple errors on the part of the trial court in improperly denying GM's challenges for cause were not harmless, whether or not it could have been shown that the jury ultimately seated was unbiased and impartial.
The trial court erred in denying GM's challenges for cause as to the five veniremembers related to attorneys in this case. Therefore, the trial court erred in denying GM's motion for a new trial, and we reverse that portion of the postjudgment order. Because we hold that GM is entitled to a new trial, we pretermit consideration of other issues raised by GM.
 IV. Venue and Recusal
We note that at oral argument, GM's counsel urged us to remand this case with an order that it be transferred to a county other than Bullock County for retrial. In essence, GM asks us to review the trial court's denial of its motion for a change of venue. It has long been the law that a ruling on a motion for a change of venue for cause, made pursuant to § 6-3-20, Ala. Code 1975, will not be reviewed on an appeal from a final judgment, but instead, review of such a ruling in a civil action is by a petition for a writ of mandamus. Mathis v. Board of School Comm'rs of MobileCounty, 289 Ala. 552, 268 So.2d 822 (1972). Accord NYTCOServs., Inc. v. Wilson, 351 So.2d 875 (Ala. 1977). A change-of-venue motion for cause, based on the alleged inability of the moving party to receive a fair trial in the forum county, is different from a motion to transfer venue when venue is improper pursuant to § 6-3-21, Ala. Code 1975, based on the place of residence or business of a party. Elmore County Comm'n v.Ragona, 540 So.2d 720 (Ala. 1989). A ruling on a motion for a transfer of venue when venue is improper may be reviewed either by way of a petition for writ of mandamus or on appeal from a final judgment. Ragona, 540 So.2d at 725.
Indeed, while GM acknowledges that this Court's review of a ruling on a motion for a change of venue for cause is limited to a mandamus proceeding, it nevertheless contends that this issue "deserves full appellate review on the merits" and invites us to consider the issue because "justice so requires." We decline that invitation, especially when the motion for a change of venue was filed less than a month before trial was scheduled to begin, when the petition for a writ of mandamus seeking review of the ruling on that motion was filed three days after trial began, and when we have already denied that petition. On remand, should GM determine that circumstances then existing warrant a change of venue, it can petition the trial court for that relief.
We now turn to GM's contention that we should review the trial court's denial of its motion to recuse. Jernigan insists that, as is the case with a ruling on a motion for a change of venue, a ruling on a motion to recuse is reviewable only by a petition for a writ of mandamus. This Court has held otherwise. Review of the denial of a motion to recuse is appropriate either upon a petition for a writ of mandamus or upon an appeal from a final judgment. Woodward v. Roberson, 789 So.2d 853 (Ala. 2001). We conclude, nevertheless, that Jernigan offered substantial evidence indicating that GM waived any objection it may have had to Judge Smithart's vacation trip with several lawyers, one of whom represents Jernigan in this *Page 674 
case. As to GM's other grounds in its motions to recuse, we note that a "mere accusation of bias" that is not supported by substantial facts does not require a judge's recusal. Oliver v.Towns, 738 So.2d 798, 804 (Ala. 1999). The test is whether a person of ordinary prudence who knows all of the facts known to the judge would conclude that there is a reasonable basis upon which to question the judge's ability to be impartial. Id. Upon the record presented to us, we conclude that Judge Smithart's recusal is not required.
 V. Conclusion
We affirm the portion of the post-judgment order denying GM's motions for a JML, but we reverse the portion of the postjudgment order denying GM's motion for a new trial, and remand the case for a new trial consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HARWOOD and WOODALL, JJ., concur.
JOHNSTONE, J., concurs in the rationale in part and concurs in the judgment.
SEE, BROWN, and STUART, JJ., dissent.
HOUSTON, J., recuses himself.*
[1] We have included in this opinion only those facts essential to the resolution of the issues discussed in this opinion. We have not in all instances marshaled evidence offered by GM to rebut substantial evidence adduced by Jernigan. Such an exercise would serve no purpose, because it is inappropriate to reweigh the evidence heard and apparently rejected by the jury. The facts set forth include those disputed by the parties. By reciting those facts, we do not endorse their accuracy; we simply restate evidence the jury was free to accept or reject.
[2] In view of our disposition of this appeal, we pretermit further discussion of the extent of Jeffrey's injuries.
[3] Jernigan also sued Bill Jackson Chevrolet-Olds-Cadillac, Inc., the dealership from which Jernigan bought the Oldsmobile; Capitol Chevrolet and Imports, Inc., the dealership that originally sold the Oldsmobile; and Valeria Crittenden, the driver of the Pontiac. Before the case was tried, Jernigan dismissed the Jackson dealership and Crittenden and the trial court entered a summary judgment in favor of Capitol Chevrolet. Thus, none of those defendants is a party to this appeal.
[4] In its brief to this Court, GM says that the jury deliberated for one hour. The record reflects, however, that the jury retired to begin its deliberations at 12:35 p.m. and informed the bailiff that it had reached a verdict at 3:45 p.m. The record does not reflect any intervening breaks.
[5] Section 6-11-21(a) provides: "Except as provided in subsections (b), (d), and (j), in all civil actions where an entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or five hundred thousand dollars ($500,000), whichever is greater."
[6] Jernigan is represented by Beasley, Allen, Crow, Methvin, Portis Miles, P.C.; Gray, Langford, Sapp, McGowan, Gray 
Nathanson; Jinks, Daniel Crow; and Frank M. Wilson, P.C.
[7] It is not clear from the record whether Myron Penn was seated with Jernigan's counsel during jury selection or was elsewhere in the courtroom. The record reflects only that the trial court stated to the venire: "Of counsel [to the Jinks firm] is Mr. Myron Penn seated to my right over here."
[8] The record reflects that to achieve a "shaved-back" end the tubular door-guard beam is cut to length and tapered on both ends.
[9] In its appellate brief, GM criticizes Mundo's statement, saying it was made without regard to the speed of the vehicles in the test, although it is not clear from the context whether his testimony is without regard to 30-mph versus 35-mph or without regard to any speed.
[10] GM contends in its brief, contrary to Knickerbocker's testimony, that "[i]n fact, without dispute the supposed `likelihood' [of a serious head injury] at 1000 HIC — or for that matter a little above or below — is only 16 percent." How evidence can be "without dispute" when it is contradicted by GM's own witness, Knickerbocker, is not explained. Dr. Joseph Rice, GM's automotive safety expert, testified on behalf of GM that "head injury criteria . . . [is] a sliding scale, and . . . it's a measure of the probability that an adult person will have a serious or severe head injury at this magical number of 1000 that everybody quotes. What that really means is that 16 percent of the adult population will have a severe — serious or severe head injury." In actuality, GM simply prefers Rice's testimony on this subject.
[11] FMVSS 208 sets a standard of 1000.
[12] The dissent states that Jernigan does not provide a "meaningful discussion of the utility of the first-generation H-car in comparison to the Oldsmobile." 883 So.2d at 676. To the contrary, a comparison of the crash-test data from the first- and second-generation H-cars shows that the majority of the HIC scores from tests of first-generation H-cars were lower than the majority of the HIC scores from tests of second-generation H-cars conducted after GM had made the four design changes Mundo identified as defects. The jury could have concluded that the crash-test data implicated concerns about safety that transcended concepts related to styling, cost, and desirability in determining the utility of the alternative design.
[13] GM and the amicus curiae criticize Mundo's testimony because, they say, he did not know how far the automobile's structures intruded into the occupant compartment as the result of the crash. As we discuss in another section of the opinion, Mundo also testified: "But what I do know as a design engineer is that the restraint system was [designed] to allow the occupant to stroke through the seat belt system without striking dash panels and hinge pillars. So there is usually not a lot of margin for error here in that allowing these pillars to come in at all presents a risk."
[14] Mundo explained that FMVSS 214 is "a standard that has two components to it for side-impact protection."
[15] Rule 702, Fed.R.Evid., was amended in 2000 to reflect the standard announced in Daubert. It now differs from Rule 702, Ala. R. Evid. We quote Rule 702, Fed.R.Evid., below; the deviation from Rule 702, Ala. R. Evid., is underscored:
 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."
[16] GM's trial counsel consisted of attorneys from an Atlanta, Georgia, firm with the assistance of local counsel from Eufaula. GM's appellate briefs are signed only by an attorney from a San Francisco, California, firm, but also show the Atlanta firm and a Birmingham firm as additional counsel.
[17] The dissent states, as does GM in its brief, that Mundo embraced and then abandoned the Ford Taurus as the embodiment of his alternative designs. There are two problems with that statement.
First, the evidence upon which GM relies in arguing that Mundo proffered, and then abandoned, the Taurus as the embodiment of his alternative designs was not before the jury. GM relies upon testimony given by its expert Michael Holcomb that was introduced outside the presence of the jury during an offer of proof from GM regarding the admissibility of the crash test using the Taurus. GM argued the admissibility of the crash test only in support of its motion for a new trial. It is inappropriate to use this evidence, which was never presented to the jury, to argue that GM is entitled to a JML.
Second, even if the evidence should be treated as having been submitted to the jury in order to evaluate whether Jernigan's evidence can withstand a JML, whether Mundo "abandoned" the Taurus as an alternative design is sharply contradicted. Testifying during the offer of proof outside the presence of the jury, Holcomb stated that it "seemed clear" to him from reading Mundo's deposition that Mundo considered the Taurus to be the alternative design in this case. He could not, however, point to any statement in Mundo's deposition where Mundo himself testified that he relied exclusively on the Taurus as an alternative design. Jernigan contends that Mundo never offered the Taurus as an embodiment of everything he recommended as an alternative design. In an earlier sidebar during Mundo's testimony, also outside the presence of the jury, GM's trial counsel told the court that Mundo "gave one alternative design" and that that design was the Taurus; Jernigan's counsel contradicted that statement. As we discuss herein, Mundo used the Taurus as one of the examples that illustrated his alternate designs. He stated in the presence of the jury during cross-examination that although he was involved in designing the Taurus when he worked for Ford Motor Company, he had "never praised the Ford Taurus as being the be all, end all." A conclusion that Mundo relied exclusively upon the Taurus as the embodiment of his alternative design and then abandoned that theory would require us to construe the evidence in favor of the losing party. In deciding whether GM is entitled to a JML, we are, of course, obligated to construe the evidence in favor of Jernigan, the prevailing party.
[18] The dissent relies upon Beech v. Outboard Marine Corp.,584 So.2d 447 (1991), to say that Jernigan suggests that "GM should have experimented to find a safer, practical, alternative design for the entire automobile." 883 So.2d at 677. The dissent refers to an "invitation to experiment," a phrase that has not previously been used in cases rejecting proposed safer, practical, alternative designs. Moreover, the use of that phrase in this case implies that we are here dealing with untried and unproven concepts. Such was the case in Beech, where the plaintiff contended that Outboard Marine Corporation should have experimented with an untried propeller guard around a pleasure boat's outboard-motor propeller. The alternative designs proposed here by Mundo dealt with automotive designs that were tried and proven rather than experimental.
[19] To prove that the utility of the alternative design outweighed the utility of the design actually used, a plaintiff can demonstrate factors such as the product's intended use; its styling, cost, and desirability; its safety aspects; the foreseeability of the accident; the likelihood of injury; the probable seriousness of the injury if the accident happened; the apparent nature of the defect; and the manufacturer's ability to remove the defect. Hannah, 840 So.2d at 858.
[20] Consanguinity measures the relationship by blood and affinity measures the relationship by marriage. Norris v.Presley, 292 Ala. 155, 290 So.2d 643 (1974).
[21] We quoted this footnote in Bethea v. Springhill MemorialHospital, 833 So.2d at 7 n. 6.
[22] An example of a juror who served after GM says it had exhausted all of its peremptory strikes was an individual who GM states had heard about the case, had had "professional dealings" with Jernigan, knew one of Jernigan's witnesses, had worked for Myron Penn's campaign for the state senate or had one of his campaign bumper stickers on her car, had an aunt who had been killed in an automobile accident, had been in a serious accident with her mother in which she was injured, and had filed a lawsuit as a result of that accident.
* Note from the reporter of decisions: At the time this case was decided the office of chief justice was vacant. Rule 16(b), Ala.R.App.P., provides that when by reason of disqualification the number of Justices competent to sit in the determination of a cause is reduced, a majority shall suffice, but in no event may a cause be determined unless at least four Justices sitting shall concur.